IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Nyieshia Maclin,                          )
                                          )       Case No. 04 C 4176
                    Plaintiff,            )
                                          )       Judge Mark Filip
        v.                                )
                                          )
A.M. Bus Co., Inc., Eddie                 )
Williams, and Eric Weathersby,            )
                                          )
                    Defendants.           )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Nyieshia Maclin ("Maclin"), has sued A.M. Bus Co., Inc. ("A.M. Bus Co."),

Eddie Williams, and Eric Weathersby, alleging a violation of Title VII (Count I) and intentional

infliction of emotional distress ("IIED") (Count II) under Illinois law. (D.E. 1.) The case is

before the Court on Defendants' motions for summary judgment with respect to Count I (D.E.

49) and Count II (D.E. 52) and Defendants' motions to strike certain paragraphs contained in

Plaintiff's revised statement of additional facts (D.E. 70) and the affidavit of Chester Tindall

(D.E. 69). As set forth below, the motions for summary judgment are granted.[1]

---

[1]     Defendants filed a motion to strike Plaintiff's original statement of additional
facts. (D.E. 62.) Because the motion was well taken, the Court granted Defendants' motion
without prejudice, in that the Court gave Plaintiff an opportunity to file a revised statement of
additional facts. (D.E. 64.) Defendants thereafter filed the motion to strike Plaintiff's revised
statement of additional facts. For the reasons discussed below, the Court grants Defendants'
motion to strike the affidavit. (D.E. 69.) The Court addresses Defendants' motion to strike the
revised statement of additional facts (D.E. 70) as relevant throughout this opinion. In this regard,
the Court notes that some of Defendants' objections are legitimate, while others are
unpersuasive. The Court rules on certain individual paragraphs identified by Defendants, draws
only from the portions of the responses that are appropriate, and ignores any improper additional
statements of fact. Thus, the Court grants in part and denies in part Defendants' remaining
motion to strike.

I.    Relevant Facts

A.    Threshold Local Rule 56.1 Issues

The relevant facts are taken from the parties' filings under Local Rule 56.1 ("L.R. 56.1"). As is the practice in this district, the Court only considers those facts or additional facts that are presented in conformity with L.R. 56.1.

In this regard, the Seventh Circuit has "consistently and repeatedly upheld a district court's discretion to require strict compliance" with L.R. 56.1. *See Bordelon v. Chicago Sch. Reform Bd. Of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000); *accord Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 809 (7th Cir. 2005). The Seventh Circuit and district courts have not been wedded to enforcement of the local rule as a matter of mere formalism. Rather, precedent acknowledges that it is a "reasonable judgment" that "consistent, 'bright-line' enforcement is essential"—not only in promoting compliance with the local rule, but also "to ensuring that [the] long-run aggregate benefits in efficiency" that L.R. 56.1 is intended to produce are realized for the system of justice in the Northern District of Illinois. *Kozola v. Bd. of Ed. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004) (collecting cases); *accord, e.g., Midwest Imports v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995). In addition, the process established in L.R. 56.1 (and its predecessor, L.R. 12(M) and (N)), helps focus and narrow the factual disputes so the court is not attempting to guess at what fairly can be argued and inferred from an often substantial (and, at times, even massive) factual record; that dynamic helps to ensure that the summary judgment process best promotes fair results for all.

In the motion to strike Plaintiff's revised statement of additional facts, Defendants argue that Plaintiff failed to conform with the Court's standing order, which limits a summary

judgment non-movant to 50 separate statements of fact, absent leave granted for more, and L.R. 56.1, which prohibits lumping multiple assertions into a single paragraph. (D.E. 70 ¶ 1.) By way of background, when ruling on Defendants' motion to strike Plaintiff's original L.R. 56.1 statement, the Court granted Plaintiff a modest extension over the 50-statement rule to 60 statements, but clarified that "they have to be 60 legitimate, single statements." (Hr. Tr. 8/11/05 at 1.) Plaintiff's revised statement of additional fact, which consists of 58 paragraphs, falls within the 60 statement extension afforded by the Court, but disregards the Court's admonition, consistent with extensive caselaw, regarding "legitimate, single statements."

Local Rule 56.1 statements must be short and concise. At a minimum, the following paragraphs in Plaintiff's revised L.R. 56.1 statement lump together several separate facts: 6, 32, 39, 45, 46, 53 and 54. (D.E. 68.) The compounding of facts into an agglomerated paragraph is not permissible. Similar to the rule against compound questions on cross-examination, the inclusion of several facts in a single paragraph tends to confuse and obscure the issues. *See, e.g.*, *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) ("[I]t is inappropriate to confuse the issues by alleging multiple facts in a single paragraph in hopes of one's opponent missing one."). In addition, such compounding of facts is almost always unnecessary; as a practical matter, if a non-movant cannot put forth a disputed issue of material fact in fifty (or in this case, sixty) tries, it is unlikely that a different result will obtain if the non-movant includes more alleged disputed facts in compounded paragraphs. Given that compound paragraphs tend to promote confusion and inefficiency, and given that the single-fact rule and reasonable limits on paragraphs does not produce unfairness, the Rule 56.1 framework that has developed is a reasonable one. In any event, the Court disregards the paragraphs identified above, as they are not in compliance with

3

the Local Rule 56.1 framework and the prior order in this case.

Defendants move to strike numerous additional statements of fact. (*See* D.E. 70.) The

Court addresses these statements individually in its recitation of facts, as appropriate. For the

reasons explained below, however, even if one were to ignore Plaintiff's procedural deficiencies,

Defendants would still be entitled to summary judgment.[2]

B.    Affidavit of Chester Tindall

Defendants move to strike Chester Tindall's affidavit on the ground that the affidavit is in

essence character or propensity evidence offered to show that A.M. Bus Co. acted in conformity

therewith. (D.E. 69.) Such evidence is usually inadmissible under Rule 404(b) of the Federal

Rules of Evidence. Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character
> of a person in order to show that he acted in conformity therewith. It may,
> however, be admissible for other purposes, such as proof of motive, opportunity,
> intent, preparation, knowledge, identity, or absence of mistake or accident.

Fed. R. Evid. 404(b).

Plaintiff did not respond to the motion to strike—likely waiving the issue. Given

Plaintiff's failure to file a response, it is difficult to surmise the exact basis for which Plaintiff

would offer the affidavit. The framework suggested by Defendants—that the affidavit is offered

as propensity evidence—seems correct, and is supported by statements in other pleadings filed by

---

[2]    The Court does not mean to imply that it is excusing Plaintiff's procedural
infractions. Plaintiff has counsel, and she was specifically advised that she needed to comply
with the local rules and was even given a second chance to present appropriate filings and an
extension to the presumptive paragraph limits. Nonetheless, even if one were to ignore the
violations and to try to decipher the materials Plaintiff includes in improper format, it appears
clear that her case would be subject to summary judgment for failure, *inter alia*, to present a
similarly situated comparator or to demonstrate extreme and outrageous conduct within the
meaning of applicable precedent, as explained below.

Plaintiff in the case. (*See* D.E. 66 at 10 ("Such evidence indicates the measures Defendant would take to preserve its money.").) To the extent Plaintiff would argue that the affidavit provides evidence that individuals that are similarly situated to Plaintiff were not terminated (D.E. 65-1), Plaintiff is off the mark. The affidavit does not mention or address the termination of any employee at A.M. Bus Co., let alone any similarly situated ones. In addition, to the extent Plaintiff believes she was shortchanged under a contract between Defendant and Chicago Public Schools, that issue is not relevant to the claims at issue in the case—namely, alleged termination motivated by pregnancy discrimination and an alleged intentional infliction of emotional distress. Finally, Mr. Tindall was never disclosed as a witness having knowledge of any relevant and material facts, and neither the affidavit nor the documents underlying the affidavit were disclosed during the course of discovery. *See* Fed. R. Civ. P. 37(c)(1) (prohibiting reliance on a surprise affidavit unless the party failing to properly disclose the witness has a substantial justification for the failure and there is no prejudice to the other party); *accord, e.g., Mayer v. Kemper Ins., Inc.*, No. 98 C 8124, 1999 WL 754684, at * 1 (N.D. Ill. Sept. 10, 1999) (citing *Antoine-Tubbs v. Local 513, Air Transport Div.*, No. CIV.A. 3:96-CV-0572-P, 1998 WL 953725, at *3 (N.D. Tex. Sept. 22, 1998) and *Conrad v. P.T.O. Servs., Inc.*, No. 95 C 2622, 1996 WL 296652, at *3 (N.D. Ill. June 3, 1996)). Plaintiff has not demonstrated substantial justification for her failure to disclose the affidavit, or that the failure to do so was harmless to Defendants (*e.g.*, that Defendants had notice that Mr. Tindall may have had information relevant to the case). For all of these independent reasons, the Court grants Defendants' motion to strike the affidavit.[3]

---

[3]     The Court also disregards paragraphs 55-58 of Plaintiff's revised statement of additional facts to the extent they are supported by Chester Tindall's affidavit. *Accord, e.g., Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000). These statements also pertain to matters

C.    Facts[4]

Ms. Maclin was initially hired by A.M. Bus Co. in September 2001 to work as a bus attendant. (D.E. 54 ¶ 1.) She voluntarily left the company in February 2002 to work at Walgreen's. (*Id.* ¶ 2; D.E. 68 ¶ 10.) She was not covered under the A.M Bus Co.'s health plan, as she received health insurance under her mother's health plan at Mayer Brown and Platt. (D.E. 54 ¶ 2; Pl. Dep. at 26.)

Ms. Maclin was rehired by the company as a bus attendant in September 2003. (D.E. 54 ¶ 3.) Ms. Maclin's rate of pay was $7.70 per hour, and she worked 30 hours per week. (*Id.* ¶¶ 4 and 7.)[5] Her job duties included attending to children with behavioral problems and special needs. (*Id.* ¶ 5.)

Ms. Maclin states that she was pregnant from October 2003 through July 2004 and gave birth to her child on July 20, 2004. (D.E. 68 ¶ 2, Ex. 2 ("Plaintiff Aff.") ¶ 2.) The father of Ms. Maclin's child, Sean Morgan, was employed as a mechanic at A.M. Bus Co. (D.E. 68 ¶ 3.) In December 2003, Ms. Maclin and Mr. Morgan announced the pregnancy to co-workers and received congratulations and well-wishes at the company's holiday party from, among others, Pamela Williams, the president of A.M. Bus Co. (*Id.* ¶ 4.) Mr. Morgan died on January 1, 2004. (*Id.* ¶ 3.) A.M. Bus Co. employees attended the funeral, including Defendants Eddie Williams

---

that are not admissible on relevance grounds and Rule 404(b) grounds.

[4]    Where the parties disagree over relevant facts, the Court sets forth the competing versions. The Court resolves genuine factual ambiguities in Plaintiff's favor. *See Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

[5]    The parties disagree on whether Maclin's rate of pay was $7.00, $7.70, or even should have been $8.47 per hour. The exact amount of Maclin's pay rate is not material to the Court's decision.

and Eric Weathersby, as well as Pamela Williams, who offered condolences and assistance to Ms. Maclin. (*Id.* ¶ 5.) Ms. Maclin states that, upon Mr. Morgan's death, she was depressed and extremely concerned about the future. (*Id.* ¶ 8.)[6]

In February 2004, Ms. Maclin maintained health insurance coverage pursuant to the insurance plan provided by her mother's employer. (D.E. 54 ¶ 9.) At this time, Ms. Maclin's doctor had not placed any significant restrictions on her work activities. (*Id.* ¶ 11.)

Ms. Maclin claims that between January 2004 and her termination of employment, Defendant Weathersby twice told her, without her requesting it, and without explanation, that her route would be changed so that she would not have to strap down wheelchairs down on the bus. (D.E. 68 ¶ 17, Plaintiff Aff. ¶¶ 20-22.) Defendants dispute that Mr. Weathersby made this statement, but of course that factual dispute goes to the Plaintiff. Plaintiff claims that she did not want her job duties modified because she did not regard them as strenuous, and she wanted to continue to have some physical activity while pregnant. (D.E. 68 ¶ 18.) The parties agree that Plaintiff never told anyone at the company that she did not want her job duties modified. (*Id.*) Plaintiff says she never voiced any disagreement because she felt she had no choice. (*Id.*)

By the latter period of her employment at the bus company, Ms. Maclin was reassigned to routes 54 and 56. (D.E. 54 ¶ 13; D.E. 68 ¶ 13.) Joseph Watson was the bus driver assigned to these routes. (D.E. 54 ¶ 13.) Prior to February 11, 2004, Ms. Maclin and Mr. Watson argued on at least two occasions. (*Id.* ¶ 14.) Ms. Maclin states that she wrote up Mr. Watson for swearing

---

[6]    In the motion to strike, Defendants argue that the effect of Mr. Morgan's death on Ms. Maclin is not legally relevant for present purposes. Even considering these facts, however, Plaintiff does not make out a triable case of intentional infliction of emotional distress, as discussed below.

at a student. (*Id.* ¶ 15.)

On February 11, 2004, Maclin worked with Mr. Watson. (D.E. 68 ¶ 19.) They dropped off the last student for that day at approximately 3:45 p.m. (*Id.*) Defendants claim that Ms. Maclin and Mr. Watson were involved in a "fight/altercation" that occurred on one of A.M. Bus Co.'s buses that day. (D.E. 51 ¶ 5; D.E. 54 ¶ 17.) Ms. Maclin denies Defendants' characterization of the incident, instead claiming that she was the victim of an attack by Mr. Watson and that she did not instigate or participate in a fight with him. (D.E. 68 ¶¶ 21-25.)

The parties disagree on certain details regarding the February 11, 2004 incident. The disputes are not, as discussed below, material to the ultimate resolution of the motions for summary judgment. The following is Ms. Maclin's version of the incident. While returning to A.M. Bus Co. headquarters, after dropping off the last student, Mr. Watson stopped the bus and ordered Ms. Maclin off the bus, but Maclin refused. (D.E. 68 ¶ 21.) Mr. Watson then opened the front door of the bus, went to the back of the bus, grabbed Ms. Maclin by her coat and slung her to the front of the bus, yelling at her that she had to get off the bus. (*Id.* ¶ 22.) Ms. Maclin claims that she did not fight back, and instead held on to a pole attached to the front of the bus near the exit door, yelled at him to stop and told him that she was pregnant, while he attempted to push her down the stairs and out the front door. (*Id.* ¶ 23.) Mr. Watson then began to hit her on the head with his hands, still yelling at her to get off of the bus. (*Id.* ¶ 24.) Mr. Herb Morris, another bus driver employed at A.M. Bus Co., happened to be at the intersection where Mr. Watson had stopped the bus, ran over to the bus, pushed Mr. Watson off of Maclin, asking Mr.

Watson why he was hitting Maclin, and said "you know she is pregnant." (*Id.* ¶ 25.)[7] Ms. Maclin called the police and her father to inform them of what happened. (*Id.* ¶ 26.)

Continuing with Ms. Maclin's version of the incident, Mr. William Hargrove, a school bus attendant who was working with Mr. Morris, then drove the school bus that Mr. Watson and Maclin had been on (but no longer were on) and crashed into a car, damaging the car and the school bus. (*Id.* ¶ 27.) Mr. Hargrove later left the scene with Mr. Morris. (*Id.*) Maclin called A.M. Bus Co. on the bus intercom and told the dispatcher what Mr. Watson (allegedly) did and about abdominal pains she felt, and the dispatcher told her that she would call an ambulance. (*Id.* ¶ 28.) An ambulance arrived, but Maclin elected not to go to the emergency room after the paramedics checked her stomach with a stethoscope. (*Id.* ¶ 29.) While Maclin was in the ambulance, Defendant Weathersby arrived at the scene. Maclin told him that Mr. Watson had attempted to push her off the bus and had beaten her up. (*Id.* ¶ 30.) Mr. Weathersby asked her whether she intended to press criminal charges, and when she said that she did, Mr. Weathersby responded, "good." (*Id.* ¶ 31.) When Messrs. Morris and Hargrove returned to the scene, Mr. Hargrove was arrested for crashing the bus and driving without a bus license. (*Id.* ¶ 35.) Mr. Watson also was arrested at the scene. (*Id.*)

Defendants offer testimony from Defendants Weathersby and Williams, as well as Mr. Hargrove, regarding what information was provided to A.M. Bus Co. regarding the incident. Specifically, Mr. Weathersby states that Ms. Maclin never told him that Mr. Watson attempted to

---

[7]      Defendants request that this statement be stricken as inadmissable hearsay. There is no dispute that Maclin was pregnant at the time, and thus the statement is not necessarily being offered for its truth. Giving Maclin the benefit of the doubt, such evidence is properly considered when assessing the effect of the statement on Mr. Watson, to the extent that is at all relevant.

push her off the bus or beat her up. (D.E. 75, Weathersby Aff. ¶ 10.) He further attests that Mr. Watson told him that Maclin acted as an aggressor in the fight and attacked him. (*Id.* ¶ 11.) Mr. Weathersby states that he never asked Maclin whether she intended to press criminal charges. (*Id.* ¶ 12.)

Mr. Williams states that, on or about February 16, 2004, he spoke with Mr. Watson about the altercation. (D.E. 75, Eddie Williams Aff. ¶ 6.) During the conversation, Mr. Watson denied instigating the altercation or attacking Maclin. (*Id.* ¶ 7.) Mr. Williams also attests that when he spoke with Mr. Morris about the incident, Mr. Morris never said that Mr. Watson struck Maclin. (*Id.* ¶ 10.)

Mr. Hargrove, the attendant who crashed the bus, attests that when he approached the stopped bus, he saw Maclin standing in the front of the bus and to the immediate right of the driver, Mr. Watson, who was seated in the driver's seat. (D.E. 75, Hargrove Aff. ¶¶ 6-7.) According to Mr. Hargrove, when Mr. Morris entered the other bus, he found Maclin and Mr. Watson arguing, and Mr. Watson was not on top of Maclin. (*Id.* ¶ 9.) Mr. Hargrove further states that he observed Maclin exit the bus under her own power and without assistance, and then stand on the sidewalk. (*Id.* ¶¶ 11-12.) He also states that Mr. Watson exited the bus and also stood on the sidewalk, about 10 to 15 feet away from Maclin. (*Id.* ¶ 13.) Finally, he attests that he heard Maclin speak to Mr. Watson in a threatening and violent manner, telling him that she would "get her folks to get him." (*Id.* ¶ 14.)

For present purposes, while the parties disagree on the particulars surrounding the school bus altercation, particularly concerning who started it and who was blameworthy, it is clear that (i) both Ms. Maclin and Mr. Watson were involved in the fight/altercation; and (ii) neither was

admitting to being the aggressor or malefactor following the incident and the resultant property damage.

Ms. Maclin claims that she took the next two days off of work to monitor her then-unborn child's condition. (D.E. 68 ¶¶ 37-40.) When she returned to work, A.M. Bus Co. fired both Plaintiff and Mr. Watson for being involved in the fight and causing the resulting property damage. (D.E. 54 ¶ 18.)[8] Defendants explain that Pamela Williams, the company's president, made the decision to terminate Plaintiff and Watson. (*Id.* ¶ 21; *see also id.*, Pamela Williams Aff. ¶¶ 12, 15-18.) Pamela Williams states that "[b]ecause [she] was unable to determine which employee was responsible for causing the altercation/fight, both employees were terminated." (D.E. 54, Pamela Williams Affidavit ¶ 15.) Defendants further explain that Messrs. Weathersby and Williams did not make the decision that resulted in Plaintiff's termination. (D.E. 51 ¶ 12; D.E. 54, Pamela Williams Aff. ¶¶ 16-17, *see also* D.E. 75, Weathersby Aff. ¶ 14, Eddie Williams Aff. ¶ 11.) Plaintiff effectively does not deny that Pamela Williams made the decision regarding her termination (*see, e.g.*, D.E. 54 ¶ 21; D.E. 55 (Pl. Resp. to Defs. SF) ¶ 21), but she does claim that Defendant Eddie Williams is the one who told her that she was terminated and signed an

---

[8]     To be clear, throughout the briefing, Ms. Maclin maintains that she was the victim in the fight, not the instigator. She does not dispute that she was involved in the altercation. As explained further below, Ms. Maclin at points also contends that she was being fired, for example, "because the bus and a car had been damaged." (D.E. 68 ¶ 43 (citing Maclin Aff.).) Ms. Maclin also expressly testified that "they always gave me several reasons" for her termination (D.E. 54, Maclin Dep. at 25), so the Court does not view Ms. Maclin's statement that she was told she was fired because the bus and a car had been damaged as inconsistent with Defendants' position that she was fired because she was involved in a workplace physical altercation that triggered property damage to company property.

incident report concerning the altercation. (D.E. 68 ¶¶ 42-51.)[9]  Defendants admit that Mr.

Williams conveyed the termination decision to Maclin. (D.E. 75 ¶ 42.)

With respect to the termination, Maclin claims that after Mr. Williams told her she was

being fired because of the bus incident on February 11, 2004, she asked what she had done and

he said it was because the bus and a car had been damaged. (D.E. 68 ¶ 43, Plaintiff Aff. ¶ 70.)

Defendants contend that Mr. Williams told Maclin that she was being fired because she was

involved in a fight with Mr. Watson, and the fight that occurred on the bus resulted in internal

damage to the bus. (D.E. 75 ¶ 43, Eddie Williams Aff. ¶ 14.)

Maclin also claims that she attempted to obtain a written explanation for the termination

from A.M. Bus Co. (D.E. 68 ¶¶ 46-50.) Defendants submitted affidavits from Messrs.

Weathersby and Williams, in which each denied that Maclin made such request. (D.E. 75 ¶ 46-

50, Eddie Williams Aff. ¶¶ 16-17, Weathersby Aff. ¶¶ 15-16.) The parties, however, do not

dispute that Defendants did not provide Maclin with a written explanation for her termination.

(D.E. 68 ¶ 49.)[10] Ms. Maclin did receive a copy of her personnel file; after some bickering

---

[9]     Ms. Maclin's attempt to link in Mr. Weathersby to the termination decision is
unavailing. The basis Ms. Maclin identifies in her statement of fact and related Rule 56 filings
indicates only that Mr. Weathersby spoke with her with respect to her termination after she
already had been informed that she was fired. Moreover, such contact occurred when she called
Mr. Williams and requested a written explanation and Mr. Weathersby allegedly acted as a go-
between with regard to Mr. Williams and Ms. Maclin. Nothing Ms. Maclin identifies indicates
that Mr. Weathersby (contrary to his testimony and the testimony of both Ms. Williams, the
company president, and Mr. Williams) was actually involved in the decision to terminate Ms.
Maclin. (*See, e.g.*, D.E. 68 ¶ 48, Maclin Aff. ¶¶ 74-76).

[10]     Plaintiff claims that she was "depressed and extremely stressed after her firing
because she worried about her and her unborn child's financial future, as no one would hire her
while she was pregnant, she lacked financial support, had to rely on her mother, and had to obtain
government funds later to support her child." (D.E. 68 ¶ 54.) As stated above, the Court
disregards the statement on procedural grounds. Even without the threshold procedural

between the parties, Ms. Maclin received her personnel file on July 29, 2004. (D.E. 75 ¶ 50; Pamela Williams Affidavit ¶ 16.)[11]

The personnel file contained a document entitled "Disciplinary Action Incident Report," dated February 24, 2004, and signed by Defendant Eddie Williams. (D.E. 68 ¶ 51.) The report states, "Ms. Maclin was involved in a fight on the school bus with another employee at A.M. [Bus Co.]. The bus was also damaged in the fight. Ms. Maclin was terminated." (*Id.*, Ex. 2(B).) The report makes no reference to Mr. Hargrove (*id.*), who was not terminated and continued to work for the company through at least June 2005. (*Id.* ¶ 52.)

Maclin testified that Defendants fired her because "they wanted to save money" and because "they felt like I couldn't do the work and wanted to change my route." (D.E. 51 ¶ 10.)[12]

---

infirmities, however, there are other problems with this putative statement of fact. It contains hearsay (namely, Ms. Maclin's underlying support for the statement includes her representations of what her gynecologist told her concerning stress, Plaintiff Aff. ¶ 93). In this regard, the Court further notes that Dr. Kennedy, the putative hearsay declarant, was not disclosed as a potential opinion witness pursuant to Federal Rule of Civil Procedure 26(a)(2). Maclin alludes in one filing to having discussed the matter "with both ger psychiatrist and gynecologist" (D.E. 55 (Pl. Resp. to Defs. SF) at 3 ¶¶ 14-15, but her support for these representations is a non-existent paragraph of her operative statement of uncontested facts (D.E. 68).) In any event, even if the statements were credited, Plaintiff has failed to create a triable intentional infliction of emotional distress claim under the applicable standards of Illinois law.

[11]    Maclin claims that she did not get a timely response from A.M. Bus Co. when she requested her personnel file in April 2004, and therefore, she filed an action with the Illinois Department of Labor. (D.E. 68 ¶ 50.) She further claims that she received a letter from the department, dated July 12, 2004, giving her authorization to review her personnel file. (*Id.*) The parties do not dispute that she received her personnel file in July 2004.

[12]    At one point in her proffered statements of fact, Ms. Maclin states that "no one would hire her while she was pregnant." (D.E. 68 ¶ 54.) From a review of the underlying support, the Court understands this statement to mean that Ms. Maclin did not secure an offer of employment at any of the four locations where she "put in job applications" after being fired from A.M. Bus Co. (D.E. 68, Maclin Aff. ¶ 94.)

13

As a part-time employee, Maclin was not covered by the company's health insurance plan when she was terminated and was not entitled to any benefits. (D.E. 54 ¶ 20.) Maclin never mentioned her firing to her doctors, nor did she seek any medical treatment related to the firing. (D.E. 51 ¶¶ 14-15.)[13]

At least six women were employed by A.M. Bus while they were pregnant and returned back to work for the company after delivering their babies. (D.E. 54 ¶ 19.) These women are Andrea Bolding, Iesha Harold, Teresa Johnson, Denise Washington, Andreal Steay, and Pamela Williams (the president of the bus company, who made the decision to terminate Plaintiff). (*Id.*)[14]

II.     Standard of Review

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmovant cannot rest on the pleadings alone, but must identify specific facts, *see Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316,

---

[13]     As indicated (*see* note 10, *supra*), Ms. Maclin says she discussed her firing with her gynecologist and a psychiatrist, but that representation is not properly supported as is required by the local rules. The dispute is not material to the result in the case.

[14]     Ms. Maclin Claims that prior to her termination, she performed her job duties satisfactorily and never asked A.M. Bus Co. for an accommodation due to her pregnancy. (D.E. 68 ¶ 16.) She further claims that during the fall of 2003, she did not miss a day of work and she was rewarded for her perfect attendance record in February 2004 with a $75 bonus from Defendants. (D.E. 68 ¶ 12.) In contrast, Defendants claim that in September of 2003, Maclin received a written reprimand for sleeping on her route, which she refused to sign. (D.E. 75 ¶ 16, Pamela Williams Aff. ¶ 10.) Maclin's performance at work (that is, whether or not she met her employer's legitimate expectations) is not material to the Court's analysis of the case *sub judice*, as demonstrated below.

1320 (7th Cir. 1993), that raise more than a scintilla of evidence to show a genuine triable issue of material fact. *See Murphy v. ITT Educ. Servs., Inc.*, 176 F.3d 934, 936 (7th Cir. 1999) (citation omitted). Put differently, the nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in the affidavits; the nonmovant must go beyond the pleadings and support its contentions with proper documentary evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

III.    Discussion

A.    Pregnancy Discrimination Claim Pursuant to Title VII (Count I)

Title VII makes it unlawful for employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "The phrase 'because of sex' has been defined by the Pregnancy Discrimination Act (PDA), through which Congress amended Title VII in 1978, to include 'because of or on the basis of pregnancy, childbirth, or related medical conditions.'" *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 598 (7th Cir. 2003) (quoting 42 U.S.C. § 2000e(k)). Accordingly, discrimination on the basis of pregnancy is unlawful under Title VII as amended by the PDA. *See* 42 U.S.C. § 2000e-(k); *see also Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1139 (7th Cir. 1997).

Seventh Circuit precedent teaches that Title VII, as amended by the PDA, "does not protect a pregnant woman from being fired without good cause. It protects her from being fired

15

because of her pregnancy." *Gleason*, 118 F.3d at 1139 (internal quotation marks, punctuation, and citation omitted). Such precedent further instructs that, under the PDA, employers are not required to take special measures to assist pregnant women or even to offer maternity leave; instead, employers must only treat pregnant women the same as all other employees. *See, e.g.*, *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 722 (7th Cir. 1998); *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994).

"To prevail on . . . her pregnancy discrimination claim, . . . [a plaintiff] must show that she was treated differently because of her pregnancy." *Geier v. Medtronic, Inc.*, 99 F.3d 238, 241 (7th Cir. 1996); *see also Marshall v. American Hosp. Ass'n*, 157 F.3d 520, 525 (7th Cir. 1998) (on summary judgment, the court "must determine whether [the employee] presented a question of fact as to whether [the employer] treated her less favorably because of her pregnancy."). In other words, an unlawful employment practice occurs whenever pregnancy is a motivating factor for an adverse employment decision. *See* 42 U.S.C. § 2000e-2(m). There are two methods for a plaintiff to make such a showing: (1) direct evidence of intentional discrimination and (2) the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Venturelli*, 350 F.3d at 599 (citation omitted); *Geier*, 99 F.3d at 241-42.

      1.     Plaintiff Does Not Produce Direct Evidence of Discrimination.

Under the direct method, a plaintiff may present direct proof of discrimination through direct or circumstantial evidence. *See, e.g.*, *Walker v. Glickman*, 241 F.3d 884, 888 (7th Cir. 2001). "Direct evidence is evidence which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption." *Id.* (internal quotation

16

marks and citation omitted); *see also Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000) (direct evidence "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.")). Plaintiff seeks to prove intentional discrimination based upon circumstantial, rather than direct, evidence. (*See* D.E. 55 at 4.)

To survive summary judgment under the direct method of proof by reliance on circumstantial evidence, a plaintiff's evidence must point "directly to a discriminatory reason" for his or her employer's actions. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003); *accord, e.g., Castleman v. ACME Boot Co.*, 959 F.2d 1417, 1422 (7th Cir. 1992) (teaching that direct evidence will "rarely" be found). Seventh Circuit precedent distinguishes three types of circumstantial evidence: (i) evidence that when put together "compos[es] a convincing mosaic of discrimination," including suspicious timing, ambiguous statements, comments to other employees and other pieces of evidence from which an inference of discrimination can be drawn; (ii) comparative evidence, evidence which shows similarly situated individuals, individuals without whatever characteristic upon which the employer is allegedly discriminating, received systematically better treatment; and (iii) pretext evidence, evidence showing that plaintiff was qualified for the job but disfavored with respect to a person without the discriminated upon characteristic, and the reason provided for the difference is unconvincing. *Troupe*, 20 F.3d at 736-37. Plaintiff's argument is an amalgam of all three of these types of circumstantial evidence.

With respect to the first type, Plaintiff claims that she was informed twice by Defendant Weathersby, the last time coming two weeks before she was fired, that her bus route would be

changed to one where she would not have to strap down wheelchairs on the bus, without explanation. (D.E. 55 at 5.) She also claims that she was beaten up by a co-worker five days before her termination, and upon returning to work after taking a couple of days off to recuperate, Defendants told her she was being terminated for damaging a company bus. (*Id.*) She further claims that Defendants knew that someone else had damaged the bus. (*Id.*) The Court finds that this evidence does not provide a "convincing mosaic" that points directly to a discriminatory reason for Defendants' actions.

Plaintiff has not shown that Defendant Weathersby's alleged offer to change her route so she would not have to strap down wheelchairs on the bus[15] was pregnancy-related. Moreover, to the extent the route change remark is related to Plaintiff's pregnancy, the Court finds that Mr. Weathersby's remarks do not demonstrate any bias toward pregnant woman. As the Seventh Circuit has stated, if anything, they show "a concern, however indelicately put," with respect to Plaintiff's condition. *Gleason*, 118 F.3d at 1140.[16] In *Gleason*, for example, the plaintiff's supervisor, upon learning that the plaintiff had become pregnant, repeatedly suggested that she get a special shield for her computer screen to protect the baby from radiation emitted by the screen, stated that he hoped the baby's father would support the child, asked about dietary and/or alcohol restrictions for plaintiff on account of the pregnancy, and offered to give the plaintiff advice on the subject of "single parenting." *Id.*, 118 F.3d at 1137. The Seventh Circuit stated

---

[15]     Mr. Weathersby attests that he never made any such offer to Plaintiff. *See supra.*

[16]     Plaintiff does not challenge A.M. Bus Co.'s modification of her bus route because she was pregnant; instead, Plaintiff contends that Mr. Weathersby's supposed offer to change her bus route is evidence that her termination was motivated by pregnancy discrimination. *See supra.*

that such "comments may have been unwelcome and inappropriate, but they do not reveal an animus based on either the plaintiff's sex or her pregnant condition, as required under our case law in order to be actionable Title VII." *Id.* at 1140. Mr. Weathersby's offer to change Plaintiff's route may have been unsolicited, given Plaintiff's statement that she did not request or want any such accommodation, but it does not show the requisite illicit animus towards Plaintiff's sex or pregnant condition. *Id.*

Moreover, and independently, "to be probative of discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process." *Geier*, 99 F.3d at 242. Plaintiff concedes that Mr. Weathersby's remark was not made contemporaneously with her termination, but instead was made at least two weeks earlier. (D.E. 55 at 5.) To the extent that Plaintiff contends that the timing between Mr. Weathersby's remarks and her termination raises an inference of discrimination, the Court respectfully disagrees. Seventh Circuit precedent teaches that in PDA cases, under the circumstantial evidence approach, timing alone does not create a triable case of discrimination. *See, e.g., id.* Rather, a PDA plaintiff must show some connection between the pregnancy-related comments and the unfavorable employment action. *See, e.g., id.* Here, Plaintiff has failed to demonstrate any "causal nexus" between Mr. Weathersby's isolated remarks, his supposed bias against pregnant women, and the company's decision to discharge her (which was made within days of her physical altercation with Mr. Watson). *Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563 (7th Cir. 1989), teaches that direct evidence of discriminatory intent "must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question." *Id.*, 876 F.2d at 569; *accord, e.g., Hong v. Children's Mem. Hosp.*, 993 F.2d 1257,

19

1266 (7th Cir. 1993) (holding that discriminatory remarks, "when unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria, even when such statements were uttered by a decisionmaker") (citing *Smith v. Firestone Tire and Rubber Co.*, 875 F.2d 1325, 1330 (7th Cir. 1989)). Finally, the parties do not dispute that Mr. Weathersby did not meaningfully participate in the decision to terminate Plaintiff. *See* D.E. 55 (Pl. Resp. to Defs. SF) ¶ 21 (discussing only Plaintiff's allegation that she spoke with Weathersby after she was fired and had called Defendant Williams to ask for a written explanation, which Weathersby, after calling Mr. Williams, allegedly said could be supplied); *accord, e.g., Gleason*, 118 F.3d at 1140 (inquiry should focus on motivation of individual who actually made the decision to terminate plaintiff, not on the alleged statements of lower-level managers); *LaMontagne v. Am. Convenience Prods., Inc.*, 750 F.2d 1405, 1412 (7th Cir. 1984) (inquiry should focus on motivation of individual who actually made decision to terminate plaintiff, not on the alleged statements of lower-level managers). For all of these reasons, neither the alleged offer of Mr. Weathersby to change Plaintiff's route, nor the actual change in Plaintiff's route, point to the conclusion that Plaintiff's termination was based on any discriminatory criteria.

With respect to the second type of circumstantial evidence, the Court finds no evidence that Defendants treated other, similarly situated, non-pregnant employees better. Plaintiff argues that Mr. Hargrove is similarly situated to her and was treated better in that the company fired her on the ground that the bus and a car had been damaged in the fight, but Mr. Hargrove actually crashed the bus, and A.M. Bus Co. did not fire him. (D.E. 55 at 6.) Courts examine all relevant factors to determine if two employees are similarly situated; those factors may vary depending on

20

the context of the case. *Radue*, 219 F.3d at 618. In this regard, an employee "must show substantial similarity" between herself and the putative comparator. *Id.* Furthermore, "in disciplinary cases—in which a plaintiff claims that [she] was disciplined by [her] employer more harshly than a similarly situated employee based on some prohibited reason—a plaintiff must show that [she] is similarly situated with respect to performance, qualifications, and conduct." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002) (quoting *Radue*, 219 F.3d at 618) (brackets in original; emphasis omitted). "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Peele*, 288 F.3d at 320 (quoting *Radue*, 219 F.3d at 617-18) (emphasis omitted). In assessing substantial similarity, the Seventh Circuit has stated that "[a]bove all, we are mindful that the courts do not sit as super personnel departments, second-guessing an employer's facially legitimate business decisions. *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 531 (7th Cir. 2003) (citation omitted).

In the instant case, both Plaintiff and Mr. Watson were believed to be involved in a physical altercation on a company bus that resulted in damage to the bus and that eventually led to damage of another vehicle. Both Plaintiff (who was pregnant) and Mr. Watson (who was not) were fired. Plaintiff points also to Mr. Hargrove—who was charged with crashing the bus and driving without a license after he intervened following the fight and tried to move the stranded bus. (*See* D.E. 68 ¶ 27.) However, Mr. Hargrove and Plaintiff are not similarly situated, as there is no evidence that Mr. Hargrove was involved in a fight or altercation that prompted the need for Mr. Hargrove to have to drive the bus. An employer is not required to fire every employee who

was involved in an accident, and instead may look without violating the law at those who actually were involved in the fight that led to the accident initial damaging of company property.

Ms. Maclin does not dispute that she was involved in a physical alteration with Mr. Watson that led to internal damage to the bus. Instead, she maintains her view that she "was the victim of an attack by Mr. Watson and did not fight or fight back." (D.E. 55 (Pl. Resp.) at 2, ¶¶ 5, 17.) Plaintiff also does not call into material question Ms. Pamela Williams' testimony that she decided to fire both Plaintiff and Mr. Watson after the incident when the bus company was unable to determine "whether Mr. Watson or Ms. Maclin was responsible for causing the fight/altercation" that caused "serious interior damage" to the bus. (D.E. 54, Pamela Williams Aff. ¶¶ 13, 14.)

Plaintiff thus essentially proposed that the bus company should have investigated further, or should have assessed who was the aggressor and who was the victim (if such roles were clear) in the incident before firing anyone (or at least her). This is not an outlandish proposal, and the bus company certainly would have been within its rights to follow such a course. However, for present purposes, the question is not whether *this Court* would apply a zero-tolerance policy (or some analog to it) towards anyone who gets in a fight on a company bus, or whether *this Court* would have likely invested the time to try to ascertain if Ms. Maclin or Mr. Watson could fairly be labeled as the aggressor or victim. Precedent repeatedly teaches that an employer may act for reasons that strike the courts as ill-advised or improvident, so long as the employer does not act for discriminatory reasons. *See Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 772 n.13 (7th Cir. 1994) (teaching that a company's employment practices may be "medieval," high-handed," and "mistaken" so long as they are not discriminatory) (collecting cases; internal citations and

22

quotation marks omitted); *accord, e.g., Wernsing v. Dept. of Human Servs., State of Illinois*, 427 F.3d 466, 468 (7th Cir. 2005) (collecting cases); *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 151 (7th Cir. 1994) (collecting cases). Or, put differently, precedent makes clear that this court should "not sit as a super-personnel department that reexamines an entity's business decisions" for their wisdom, nuance, or calibration. *Id.* (internal quotation marks and citation omitted). A.M. Bus Co. could lawfully determine that Plaintiff and Mr. Hargrove were not similarly situated, and that the comparator to Plaintiff was the only other A.M. Bus Co. employee who was involved in the altercation, Mr. Watson, who also was fired along with Ms. Maclin. Whether Mr. Watson actually was the aggressor, or Plaintiff was the aggressor, with respect to the altercation, is not something that this Court can require A.M. Bus Co. to adjudicate or incorporate into its employment policies. As discussed below, what ultimately matters is Defendants' honest belief regarding its reasons for terminating Plaintiff. (*See* Pamela Williams Aff. ¶ 13 ("Because [she] was unable to determine which employee was responsible for causing the altercation/fight, both employees were terminated.").)[17]

Finally, with respect to the third type of circumstantial evidence, Plaintiff attempts to offer evidence that she was qualified for the position in question but was terminated instead of

---

[17] As Ms. Maclin elsewhere notes (*see* D.E. 1 ¶¶ 37-38), after the termination of Ms. Maclin and Mr. Watson, Mr. Watson ultimately pleaded guilty to a misdemeanor battery charge in connection with the incident. However, Mr. Maclin offers no authority to establish either that (1) an employer must, following an intra-workforce fight, await the ultimate culmination of whatever criminal proceeding(s) might ensue before making an employment decision relating to the fight; or (2) have its employment decisions track the results of the criminal proceedings (where charging decisions and outcomes may be driven by considerations that do not mirror or incorporate the employer's workplace priorities). In the wake of the altercation, Mr. Watson was denying culpability, and, as Pamela Williams, the president of A.M. Bus Co. stated, because she "was unable to determine which employee was responsible for causing the altercation/fight, both employees were terminated." (Pamela Williams Aff. ¶ 13.)

another person not having the forbidden characteristic (being pregnant), and that Defendants' stated reason for its decision to terminate her is a pretext for discrimination. (D.E. 55 at 6.) Specifically, Plaintiff argues that the fact that Defendant Eddie Williams told her that she was being fired for crashing the bus, but Defendants knew that Mr. Hargrove crashed the bus and did not fire him, casts doubt on Defendants' proffered reasons for Plaintiff's termination. (*Id.*) The Court respectfully disagrees.

As stated above, the Court has not been presented with any basis to reject A.M. Bus Co.'s conclusion that Mr. Watson, rather than Mr. Hargrove, is the similarly situated comparator; nor does the law allow this Court to require the bus company or Ms. Williams to have made a more nuanced assessment of whether there potentially was a victim and aggressor in the fight who might be treated differently.

Plaintiff simply has not cast doubt on Plaintiff's proffered reason for her termination. Plaintiff claims Defendant Eddie Williams told her she was fired "because the bus and a car had been damaged." (D.E. 68 ¶ 43.) Mr. Williams attests that he told Plaintiff that "she had been fired because she was involved in [a] fight with Mr. Watson and the fight that occurred on the bus resulted in internal damage to the bus." (Eddie Williams Aff. ¶¶ 13-14.) The parties do not dispute that Eddie Williams was the messenger regarding Plaintiff's termination, and that Pamela Williams, the president of the company, was responsible for making the termination decision. *See supra.* Even assuming that Plaintiff's version of the facts is accurate (which the Court need not decide for present purposes), Plaintiff herself expressly acknowledged that Mr. Williams always told her that her firing was prompted for multiple reasons. (D.E. 54, Maclin Dep. at 25 ("They always gave me several reasons.").) Given this acknowledgment, the two versions of the

24

termination conversation provided by Plaintiff and Mr. Williams are not incompatible and do not suggest that Mr. Williams changed his story to avoid Title VII liability. *Accord, e.g., Schmidt v. R. Lavin & Sons, Inc.*, No. 00 C 0804, 2001 WL 290362, *8-9 (N.D. Ill. Mar. 22, 2001) (testimony providing two bases to support employee's termination, where there is no testimony stating that either basis was the sole reason for the termination decision, does not constitute a change in story, or, for that matter, evidence of pretext); *see id.* at *10 ("to demonstrate an employer's ostensible justification is unworthy of credence, an employee must present evidence tending to prove that the employer's proffered reasons are factually baseless, did not actually motivate the discharge in question, or are insufficient to motivate the discharge.") (citing *Perez v. Colwell Sys., Div. of Deluxe Corp*, 83 F. Supp. 2d 976, 984 (C.D. Ill. 1999)); *see also Hudson v. Chicago Trans. Authority*, 375 F.3d 552, 561 (7th Cir. 2004) ("Where a defendant has proffered more than one reason for the challenged action, a plaintiff must address all of the employer's suggested reasons."). In fact, the record is replete with evidence demonstrating that Plaintiff was terminated not only for damage to the bus, but also for fighting with Mr. Watson. (*See, e.g.*, D.E. 54, Pamela Williams Aff. ¶ 15 ("Because [she] was unable to determine which employee was responsible for causing the altercation/fight, both employees were terminated."); D.E. 68 ¶ 51, Ex. 2(B) (Disciplinary Action Incident Report, dated February 24, 2004, approximately ten days after the termination, and signed by Eddie Williams, provides "Ms. Maclin was involved in a fight on the school bus with another employee at A.M. [Bus Co.] The bus was also damaged in the fight. Ms. Maclin was terminated.").)[18] In short, as discussed further below, Plaintiff has

---

[18]    Plaintiff also argues that Mr. Weathersby "provided his tinge of events, and perhaps his own recommendations, that they 'cut their losses' and let Plaintiff go lest they incur potential additional pregnancy related problems . . . ." (D.E. 55 at 7.) Plaintiff has provided no

failed to demonstrate a triable issue concerning pretext.

Before concluding on this issue, the Seventh Circuit's decision in *Gleason* instructs that this Court should also look at any record evidence which shows that anti-pregnancy "bias did not play a role in the decision to terminate" Ms. Maclin or that the company's "treatment of pregnant employees" was "fair and proper." *Id.*, 118 F.3d at 1141-42. Although not necessary for the Court to reach its conclusion, the Court further notes that such evidence reinforces the conclusion that Plaintiff has failed to create a triable case regarding discrimination under the direct method. Specifically, six other employees were employed by A.M. Bus Co. during their respective pregnancies who returned to the company after delivering their babies—including the company president, Ms. Pamela Williams. (D.E. 54 ¶ 19; Pam Williams Aff. ¶¶ 9-11.) This evidence further supports the conclusion reached above. *Accord Gleason*, 118 F.3d at 1141-42.

In sum, the Court concludes that the evidence put forth by Plaintiff is insufficient to create a triable question regarding whether Plaintiff's termination was motivated, even in part, by the fact that she was pregnant. Plaintiff has thus failed to come forward with sufficient circumstantial evidence to support an inference of discrimination under the direct method.

      2.    Plaintiff Also Fails to Establish A *Prima Facie* Case Under The Burden Shifting Method.

---

evidence that Mr. Weathersby actually made any such recommendation. Moreover, and independently, there is no evidence before the Court that indicates that Mr. Weathersby had any meaningful role in the company's decision to terminate Plaintiff; instead, the record reflects that Ms. Williams was the relevant decisionmaker. (*See* D.E. 55 (Pl. Resp. to Defs. SF) at 2 ¶ 21 (showing only that Plaintiff spoke with Mr. Weathersby after she was fired, and that Mr. Williams simply told Plaintiff she had been fired and signed an incident report relating to the incident); *see also* D.E. 54, Pamela Williams Aff. ¶¶ 13, 16-18 (indicating that Pamela Williams and not Mr. Williams or Mr. Weathersby made the decision to fire Plaintiff); D.E. 75, Weathersby Aff. ¶ 14 (same); Eddie Williams Aff. ¶¶ 1-12 (same, and further reflecting that Mr. Williams informed Ms. Maclin that she had been fired).

Plaintiff also proceeds under the indirect method set forth in *McDonnell Douglas*. Under this approach, she must first establish a *prima facie* case of discrimination by presenting evidence that: (1) she is a member of a protected class, (2) she was meeting her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) she was treated less favorably than others not in the protected class who were similarly situated. *See, e.g., Ajayi*, 336 F.3d 520 at 531. If Plaintiff establishes a *prima facie* case of discrimination in this manner, the burden then shifts to Defendants to articulate a legitimate non-discriminatory reason for the adverse employment action. *Id.* Defendants are entitled to summary judgment unless Plaintiff rebuts the evidence of a non-invidious reason, or raises a triable issue as to whether the offered reasons are pretextual. *See, e.g., id.*

Plaintiff was pregnant at the time of her termination. Thus, she meets two of the elements of the *prima facie* case: she is a member of a protected class and she suffered an adverse employment action. Plaintiff must also show that she was treated less favorably than similarly situated individuals who were not in her protected class. A "similarly situated" individual is one who is "directly comparable to [the plaintiff] in all material respects." *Ajayi*, 336 F.3d at 531-32 (citation omitted); *see also id.* (listing typical factors used to assess similarly situated comparator issue). "This requires the plaintiff to show not only that the employees reported to the same supervisor, engaged in the same conduct, and had the same qualifications, but also show that there were no 'differentiating or mitigating circumstances as would distinguish . . . the employer's treatment of them.'" *Ineichen v. Ameritech*, 410 F.3d 956, 960-61 (7th Cir. 2005) (quoting *Radue*, 219 F.3d at 617-18)). The Seventh Circuit has instructed, in the context of the comparator analysis (among others), that district courts "do not sit as super personnel

27

departments, second-guessing an employer's facially legitimate business decisions." *Ajayi*, 336 F.3d at 532 (citation omitted).

The Court finds that A.M. Bus Co. could reasonably believe that Mr. Watson, rather than Mr. Hargrove, is the similarly situated comparator with respect to Plaintiff. There also is no question that Mr. Watson and Plaintiff were in fact treated similarly—that is, for better or worse, both were terminated after their physical altercation. In arguing that there is a triable issue of material fact concerning which employee is similarly situated to Plaintiff, Plaintiff attempts to create confusion where none exists. There is no evidence that Mr. Hargrove was involved in any fighting, and there is a wealth of evidence demonstrating that Mr. Watson and Plaintiff were involved in a fight and that the fighting resulted in damage to a company bus. One can note (as Plaintiff does) that Mr. Hargrove ultimately caused damage when he interceded and moved the company bus, but the company is allowed to conclude that his act of moving the bus in the wake of the fight (even moving it without a proper driver's license) and hitting another vehicle in the process was less objectionable than being involved in a workplace fight that also led to damage of the bus and prompted the need for Mr. Hargrove to intervene. It is not enough for Ms. Maclin to convince this Court that it might have acted differently had it owned or managed the bus company; instead, Ms. Maclin must satisfy her burden of showing a triable case of discrimination, and on that front, she has not carried her burden. Accordingly, the Court finds that Plaintiff cannot prove that she was treated less favorably than similarly situated individuals who were not in her protected class.

It is not necessary for Defendants to show that Plaintiff fails on all four parts of the *McDonnell Douglas* test, because a plaintiff must come forward with evidence to discharge her

28

burden with respect to all four parts of the *prima facie* case before the burden-shifting process moves forward. It is clear that Plaintiff has failed to adduce sufficient evidence to show that a similarly situated, non-pregnant employee was treated more favorably than her. That is enough to defeat her *prima facie* case and warrant summary judgment for Defendants. *See, e.g., DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 798 (7th Cir. 1995).

       3.     Summary Judgment Is Warranted For the Independent Reason That Plaintiff Fails to Create A Triable Issue Concerning Pretext.

In addition, and independently, summary judgment is warranted for the independent reason that Plaintiff has failed to create a triable issue concerning pretext. Defendants have produced evidence of non-discriminatory reasons for terminating Plaintiff; that is, that she was involved in a fight that resulted in damage to the inside of a company bus. As discussed above (*see supra*, addressing third type of circumstantial evidence under the direct approach), Plaintiff has failed to cast meaningful doubt on the Defendants' non-pretextual reason for terminating her. *See Hudson*, 375 F.3d at 562.

Under Title VII, "the focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Id.* at 784 (internal quotation and citation omitted). The Seventh Circuit also has instructed repeatedly that arguing about whether a company was correct or not concerning an honestly held basis for an employment decision is "a distraction." *Green v. Nat'l Steel Corp.*, 197 F.3d 894, 900 (7th Cir. 1999); *accord, e.g., Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997); *Davis v. Con-Way Transp. Cen. Express*, 368 F.3d 776, 784 (7th Cir. 2004) ("[A] pretext for discrimination . . . means something worse than a business error; pretext means deceit to cover one's tracks." (internal quotations and citations omitted)). Furthermore, the Seventh Circuit has

pointedly counseled lower courts that it is "not 'the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee,'" *Ineichen*, 410 F.3d at 961 (quoting *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000)), or that the employer might have "further investigated . . . before firing" the employee. *Id.* "Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Id.* (internal quotation marks and citation omitted); *accord, e.g.*, *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000).

Plaintiff presents no evidence that would tend to disprove that Defendants were lying about why she was fired. Preventing and deterring fighting in the workplace and resultant damage to company property are obviously not unlawful goals, and Plaintiff has failed to cast any meaningful doubt that Defendants were motivated by some other invidious purposes (*i.e.*, avoiding additional liability *because of* Plaintiff's pregnancy). In that regard, the Court notes that Plaintiff offers no evidence that she ever told anyone that she might switch to A.M Bus Co.'s health plan (she always had been insured to that point through her mother's employer), nor that her inclusion on the company's policy would have material impact on its benefits costs. (Indeed, it appears undisputed that, as a part-time employee, Maclin was not covered by the company's health insurance plan when she was terminated and was not entitled to any benefits under it. (D.E. 54 ¶ 20.)) In addition, the Court notes that if Plaintiff were fired, the company would save the costs of her salary, but it presumably would need (unless she was redundant or underperforming) to pay someone else to do the work in any event.

Even if Plaintiff's version of the facts is accurate, which the Court need not and does not decide, Plaintiff has presented no evidence that A.M. Bus Co. or Pamela Williams, the decision

30

maker with respect to Plaintiff's termination, is lying when she says that she fired Plaintiff for being involved in the fight and triggering the property damage. Two people were involved in the fight—Ms. Maclin and Mr. Watson—and both were fired. Ms. Maclin also does not suggest that any other person who was involved in a work-place fight at the bus company was not fired. And, as discussed above, at least several women at the bus company, including Ms. Williams herself, had left to have children and then were welcomed back to work. Under those circumstances, there is no triable case on the question of whether Ms. Williams or the bus company is lying about why Ms. Maclin was terminated.[19] Summary judgment is therefore independently warranted on the basis that Plaintiff has failed to create a triable case on the pretext issue.

B.    Intentional Infliction of Emotional Distress Claim Under Illinois Law (Count II)

In order for Plaintiff to succeed on her allegations of intentional infliction of emotional distress ("IIED") against Defendants, she must establish that: (1) Defendants' conduct was extreme and outrageous; (2) Defendants either intended or knew that there was a high probability that the conduct would cause severe emotional distress; and (3) Defendants' conduct in fact caused severe emotional distress. *See, e.g., Cook v. Winfrey*, 141 F.3d 322, 330 (7th Cir. 1998). Defendants argue that Plaintiff is unable to establish the elements of an IIED claim.

With respect to the first element, liability "has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

---

[19]  As previously stated, precedent makes clear that this Court is not empowered to avoid summary judgment if it believes that the bus company has been rather hard on Ms. Maclin, or that the bus company might have "further investigated . . . before firing her." *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005) (citing *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000)). As the Seventh Circuit has directed in this regard, "Congress has not authorized federal judges to serves as personnel managers for America's employers." *Wernsing v. Dept. of Human Servs., State of Illinois*, 427 F.3d 466, 468 (7th Cir. 2005).

decency." *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 702 (7th Cir. 1993) (citation

omitted). Further, "the law intervenes only where the distress inflicted is so severe that no

reasonable . . . [person] could be expected to endure it." *Id.* at 703. Courts in this circuit judge

the facts of each case by an objective standard to determine whether the alleged conduct was

extreme and outrageous. *Id.* Accordingly, for Defendants to be held liable, the conduct "must be

such that the 'recitation of facts to an average member of the community would arouse his

resentment against the actor, and lead him to exclaim 'Outrageous!'" *Van Stan v. Fancy Colours*

*& Co.*, 125 F.3d 563, 567 (7th Cir. 1997) (quoting *Doe v. Calumet City*, 641 N.E.2d 498, 507 (Ill.

1994), in turn quoting *Restatement (Second) of Torts* § 46 cmt. d (1965)). In this regard, for

example, "[i]t is not sufficient that the defendant has acted with an intent which is tortious or

even criminal, or that he has intended to inflict emotional distress, or even that his conduct has

been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to

punitive damages for another tort." *Cook*, 141 F.3d at 331 (internal quotation marks and citation

omitted); *accord, e.g.*, *Van Stan*, 125 F.3d at 567. Precedent further teaches that, under Illinois

law, IIED "does not arise from threats, insults, indignities, annoyances, or petty oppressions, but

coercion, abuse of power or authority, and harassment. The conduct must go beyond all bounds

of decency and be considered intolerable in a civilized community." *Brackett v. Galesburg*

*Clinic Assoc.*, 689 N.E.2d 406, 409 (Ill. App. Ct. 1997) (internal citations omitted). The Seventh

Circuit has stated that, "[r]ecognizing this high threshold, this Court and other federal courts

applying Illinois law have denied recovery to plaintiffs who alleged that their employers

subjected them to a continuous series of intentionally discriminatory acts." *Van Stan*, 125 F.3d at

568 (collecting cases).

Defendants contend that Illinois courts (i) require a higher standard of outrageousness where, as here, the IIED claim arose in an employment relationship rather than in other contexts (D.E. 50 at 4, citing, *inter alia*, *Graham v. Comm'w Edison Co.*, 742 N.E.2d 858, 867 (Ill. App. Ct. 2000)), and (ii) limit outrageous employer conduct to wrongful discharge, or the threat of wrongful discharge, to coerce the plaintiff to commit a crime or unethical acts (*id.* at 5, citing *Witkowski v. St. Anne's Hosp. of Chicago*, 447 N.E.2d 1016, 1022 (Ill. App. Ct. 1983)).[20] There is substantial support for this view, given admonitions in cases such as *Van Stan. See id.*, 125 F.3d at 567-68 (discussing employment law setting and IIED caselaw). Plaintiff, in response, alludes to caselaw which holds that an "abuse of position of power" lowers the outrageousness hurdle. (D.E. 66 at 12, citing, *inter alia*, *Wall v. Pecaro*, 561 N.E.2d 1084, 1088 (Ill. App. Ct. 1990); *McGrath v. Fahey*, 533 N.E.2d 806, 811 (Ill. 1988)).

The great majority of cases support Defendants' position. In the employment context, the Seventh Circuit has canvassed Illinois cases recognizing that personality conflicts and

---

[20] The plaintiff in *Witkowski v. St. Anne's Hosp. of Chicago*, 447 N.E.2d 1016 (Ill. App. Ct. 1983), a hospital employee for almost 25 years, sued the hospital for IIED. Plaintiff alleged that she suffered from severe arthritis and had been wrongfully discharged to prevent her from getting long-term disability benefits, and further alleged that when she was hospitalized, her supervisor falsely accused her "of unprofessional conduct by abandoning her job without prior notice." *Id.*, 447 N.E.2d at 1018. Later, when the plaintiff was at home attempting to recover from the arthritic problems, her supervisor again (falsely) stated that she was terminated because of unprofessional behavior in the form of leaving her patients unattended. *Id.* The plaintiff also alleged that the defendant-hospital's conduct aggravated a preexisting ulcer condition and caused her to suffer insomnia and made it necessary for her to take medication. *Id.* at 1021-22. The plaintiff explained that the hospital knew of her various medical weaknesses, and she also alleged that as a result of her wrongful termination, she needed to accept support from her family and dissipate her life's savings in order to survive. *Id.* at 1022. Notwithstanding these allegations, the Illinois Appellate Court found that there was not a viable IIED claim, because defendant's alleged misconduct was not "so outrageous, so atrocious and so utterly intolerable that a reasonable person could not be expected to endure it." *Id.* at 1022.

33

questioning of job performance are "'unavoidable aspects of employment'" and that "'frequently, they produce concern and distress.'" *Van Stan*, 125 F.3d at 567 (quoting *Heying v. Simonaitis*, 466 N.E.2d 1137, 1144 (Ill. App. Ct. 1984)). Because "nearly all employees would have a cause of action for intentional infliction of emotional distress" if such incidents were actionable, "Illinois courts have limited recovery to cases in which the employer's conduct has been truly egregious" and "have denied recovery for distress resulting from recognizably reprehensible conduct which has been linked to an employer's legitimate interest." *Id.* at 567-68. In *Van Stan*, for example, the plaintiff alleged that his supervisors knew that he suffered from a bipolar disorder, that the company fired him because his disorder required him to work less hours, that one of his supervisors telephoned him while he was on vacation to inform him that he had been terminated, and that after plaintiff requested an explanation, the supervisor falsely told him that he was being fired for low productivity. *Id.* at 569. Under these facts, the Seventh Circuit found that this course of conduct was not egregious, nor did it exceed all possible bounds of decency. *Id.* (relying on, *inter alia, Briggs v. North Shore Sanitary Dist.*, 914 F. Supp. 245, 248 (N.D. Ill. 1996) (allegations that the plaintiff's employer and fellow employees "hung a black 'pickaninny doll'" in her office, subjected her to racial slurs, excluded her from office social activities, placed her on probation, and refused to train her properly so as to ensure her failure, did not rise to the level of extreme and outrageous conduct) and *Harris v. First Fed. Sav. & Loan Ass'n of Chicago*, 473 N.E.2d 457, 458-60 (Ill. App. Ct. 1984) (plaintiff who alleged that her employer criticized, demoted, and discharged her after she reported alleged criminal activity to her supervisor did not state an IIED claim because plaintiff did not allege that her employer engaged in this course of conduct to coerce her into engaging into illegal activity)); *see also Harriston*, 992 F.3d at 703

34

(rejecting IIED claim where plaintiff, an African-American female, alleged discriminatory workplace mistreatment in the form of, *inter alia*, being the subject of false accusations, having her telephone calls improperly monitored through the use of an eavesdropping device, having her private vehicle damaged and vandalized on several occasions in the company's private parking lot and having higher-level management ignore her concerns for her property and personal safety, and being subject to false accusations about her job performance and a refusal to allow her to supervise white subordinates). Likewise, "in the absence of conduct calculated to coerce an employee to do something illegal, courts [applying Illinois law] have generally declined to find an employer's . . . conduct sufficiently extreme and outrageous as to give rise to an action for intentional infliction of emotional distress. This reluctance seems to be grounded in a fear that, if the anxiety and stress resulting from discipline, job transfers, or even terminations could form the basis of an action for emotional distress, virtually every employee would have a cause of action." *Welsh v. Comm'w Edison Co.*, 713 N.E.2d 679, 684 (Ill. App. Ct. 1999) (collecting cases); *accord, e.g., Witkowski*, 447 N.E.2d at 1022. All of this caselaw is consistent with general and oft-quoted language from *Heying v. Simonaitis*, 466 N.E.2d 1137 (Ill. App. Ct. 1984), in discussing employment place disputes, that to prevail on the IIED tort in Illinois, the plaintiff must be able to show (crediting her evidence for purposes of summary judgment) that "the conduct complained of is . . . so outrageous as to extend beyond all possible bounds of human decency." *Id.* at 1144; *see also id.* (conduct must be "so severe that no reasonable person could be expected to endure it").

There is at least some caselaw, however, which is in arguable tension with the cases applying a higher threshold of outrageousness in the employment context. *See Spahn v. Int'l*

35

*Quality & Productivity Ctr.*, 211 F. Supp. 2d 1072, 1076 (N.D. Ill. 2002) ("'abuse of power,' such as that of an employee over an employee, lowers the outrageousness hurdle").[21] Likewise, there are some cases applying Illinois law in which allegations of coercion of employees to commit a crime or unethical acts are not required to state a claim for relief. *See, e.g., Spahn*, 211 F. Supp. at 1072 (listing cases where IIED in an employment context did not rely on coercion or sexual misconduct).

The Court need not attempt to resolve any of the tensions in the case law to hold that summary judgment is warranted with respect to Count II in this case. Plaintiff argues that Defendants' conduct was extreme and outrageous because they "knew the strain [she] was under," created "fictional reasons for firing [her] right after she returned from a two-work-day leave of absence to monitor her and her then-unborn child's medical condition," offered "alternative fictional reasons for her firing, promising real reasons but refusing to give them, and failing to turn over her personnel file so as to learn the pretextual reason for her termination." (D.E. 66 at 12-13.) Even assuming the truth of the allegations for present purposes, Plaintiff fails

---

[21]    *Spahn* relies solely on *Doe v. Calumet*, 641 N.E.2d 498 (Ill. 1994) and *Restatement (Second) of Torts* § 46, cmt. e, at 74 (1965), to support this assertion. *See Spahn*, 211 F. Supp. 2d at 1077. Neither *Doe* nor the *Restatement* refers to or addresses the issue of employers with respect to IIED claims. *Doe* refused to grant a motion to dismiss an IIED claim brought against police officers regarding officers' response to a 911 call arising out of an incident in which a mother was locked out of her apartment after escaping from a would-be rapist; the rapist was locked inside the apartment with the plaintiff's children, whom the rapist had threatened to kill; and local police allegedly would not break down the door to rescue the children because they did not want to be exposed to any property damage claim; all leading to the repeated raping of one child and the choking of another. *Doe*, 641 N.E.2d at 502-03. The *Restatement* mentions police officers, school authorities, landlords and collecting creditors as examples of individuals who may be positioned to exercise power or authority over a plaintiff, but not employers. *Restatement* § 46, at 74. Neither *Doe* nor the *Restatement* appears to support Plaintiff in the instant case.

to point to any case, nor could the Court locate one, finding the type of conduct alleged by Plaintiff or any meaningful analog sufficiently extreme or outrageous to survive summary judgment on an IIED claim. While the Court is not unsympathetic to Plaintiff's recitation of the anxiety she felt, caselaw counsels that "[c]laims for intentional infliction of emotional distress in the employment setting have generally involved circumstances beyond what can be considered a typical employment dispute better addressed in a Title VII or equivalent suit." *Piech v. Arthur Andersen & Co.*, 841 F. Supp. 825, 831-32 (N.D. Ill. 1994) (Zagel, J.) (collecting cases); *see also Graham*, 742 N.E.2d at 867.

*McGrath v. Fahey*, 533 N.E.2d 806 (Ill. 1988), the primary case relied upon by Plaintiff, provides further guidance on application of the outrageousness requirement. First, *McGrath* teaches that sufficiently alleged IIED claims frequently involve a defendant who stood in a position of power or authority relative to plaintiff. *Id.* at 809-10. *McGrath*'s review of the cases shows that abuse of actual or apparent power to damage plaintiff's interest involves "'something very like extortion'" which "'aggravates the outrageousness of the conduct alleged'" in the case. *Id.* (quoting *Milton v. Ill. Bell Tel. Co.*, 427 N.E.2d 829, 832 (Ill. App. Ct. 1981)). Plaintiff has not alleged or produced any evidence which suggests that Defendants' conduct resembled anything close to extortion or an analogous type of coercion.

Second, *McGrath* points out that in IIED cases where the defendant is accused of improperly using a position of power or authority, the courts look at whether the defendant reasonably believed that his objective was legitimate. *Id.* at 810. While a legitimate objective does not immunize a defendant against an IIED claim, courts treat this as a "substantial factor" in evaluating the outrageousness *vel non* of the defendant's conduct. *Id.* In this case, as stated

37

above, there has been no accusation of actual abuse of power (*i.e.*, coercion or extortion), but even if such an accusation had been made, there is no doubt, as discussed above, that Defendants had a legitimate interest in minimizing and deterring workplace fights and concomitant property damage, regardless of whether one of the employees was pregnant at the time or going through a difficult time. *Accord, e.g., Gibson v. Chem. Card Servs. Corp.*, 510 N.E.2d 37, 42 (Ill. App. Ct. 1987) (in holding that IIED claim was not adequately alleged, the court placed heavy emphasis on the legitimacy of employer's objectives in preventing future thefts, after employer vigorously participated in criminal investigation of innocent plaintiff, which investigation allegedly included overbearing attempts by defendant's investigators to coerce plaintiff's confession and threats of extended incarceration of 15 years away from family); *Van Stan*, 125 F.3d at 568 (collecting cases); *Knysak v. Shelter Life Ins. Co.*, 652 N.E.2d 832, 839 (Ill. App. Ct. 1995).

Finally, *McGrath* teaches that a third potential consideration with respect to analysis of an IIED claim is the defendant's awareness that plaintiff is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. *Id.* at 811; *but cf. Van Stan*, 125 F.3d at 569 ("[T]he defendant's knowledge of the plaintiff's susceptibility does not alter the objective standard by which a court judges whether conduct is outrageous. Rather, a defendant's knowledge merely impacts the objectively reasonable person's reaction to the defendant's conduct.") (citing, among other cases, *Doe*, 641 N.E.2d at 507)). Plaintiff argues that the outrageousness hurdle should be lowered in this case based on her claim that Defendants terminated her at a time when Defendants knew that she was particularly susceptible to emotional distress (by virtue of her pregnancy, the recent incident with Mr. Watson, and the death of the father of her child). (*See* D.E. 66 at 12, relying on *Wall v. Pecaro*, 561 N.E.2d 1084,

38

1088 (Ill. App. Ct. 1990).)

With all respect, *Wall* cannot fairly be analogized to the instant case. In *Wall*, the plaintiff was able to survive a motion to dismiss her IIED claim based on the following allegations: the defendant doctor told plaintiff that she had cancer when he affirmatively knew she did not or did not know that plaintiff actually had cancer; the doctor urgently recommended that plaintiff submit to unnecessary treatment, including the surgical removal of significant portions of her head's internal structures and tissues, as well as the abortion of her viable fetus; and the doctor repeatedly told the plaintiff that if she failed to undergo these procedures, her cancer would spread rapidly. *Wall*, 561 N.E.2d at 1086. The court found that plaintiff alleged sufficient facts to survive the dismissal motion because "as a doctor [the defendant] can be charged with the knowledge [] that by reason of her pregnancy, [the plaintiff] was peculiarly susceptible to emotional stress, especially because the procedures he recommended would have resulted not only in the loss of her viable fetus but also the loss of half her face." *Id.* at 1088. Here, unlike *Wall*, the case is before the Court on a motion for summary judgment following fulsome discovery, Defendants are not in a relationship of treating physician with Ms. Maclin, and, most importantly, as discussed above, Defendants' actions do not come close to the type of outrageous conduct alleged in *Wall*. While Defendants might not have had the best timing with respect to Plaintiff's termination, there simply is nothing extreme and outrageous, in and of itself, about an employer terminating an employee for being involved in a fight on the job that triggered property damage when the employee is pregnant or going through a difficult time. *Accord, e.g., Noffsinger v. AT&T Bell Labs*, No. 90 C 6839, 1992 WL 309046, at *8-9 (N.D. Ill. Apr. 23, 1992) (granting defendant's motion for summary judgment because the fact that plaintiff was

pregnant did not mean her supervisor or the company knew that severe emotional distress was substantially certain to result, despite evidence that plaintiff's supervisor threatened and harassed her, imposed unreasonable deadlines and threatened lack of upward job mobility if deadlines were not met—all notwithstanding that plaintiff had medical directive to work limited hours and ultimately developed gestational diabetes and was so miserable that she quit). Because Plaintiff cannot demonstrate that Defendants' conduct was extreme and outrageous within the meaning of IIED caselaw, the Court grants Defendants' summary judgment motion with respect to Count II.

The Court finds an independent basis to grant summary judgment in this case, namely that Plaintiff has not demonstrated that Defendants' conduct in fact caused severe emotional distress. *See, e.g., Cook,* 141 F.3d at 30 (third element of an IIED claim). When Plaintiff was asked in deposition whether she was aware of any medical treatment that was attributable to her firing, her only response was "stress." (D.E. 51, Ex. C at 130.) When asked to describe the emotional distress she suffered, her response was "headaches, stressing, crying, trying to figure out how I am going to take care of my child without a job and not being able to get another job." (*Id.* at 131-32.) Plaintiff also contends that she saw a psychiatrist on unspecified occasion(s). (D.E. 55 (Pl. Resp. to Defs. SF) at 3 ¶ 15.) With all respect, this simply is not sufficiently severe emotional distress to survive summary judgment under applicable case law. "The emotional distress required to support the cause of action must be so severe that no reasonable person could be expected to endure it." *Adams v. Sussman & Herzberg, Ltd.*, 684 N.E.2d 935, 942 (Ill. App. Ct. 1997) (citation omitted); *see, e.g., id.* at 941-42 ("[T]he infliction of such emotional distress as fright, horror, grief, shame, humiliation and worry is not sufficient to give rise to [an IIED] cause of action."); *Knysak*, 652 N.E.2d at 840 (plaintiff failed to show requisite severity of

40

emotional distress where plaintiff, who alleged that his wife was wrongfully denied insurance coverage for medical bills stemming from her stroke, testified that "he was very upset, very nervous, and very depressed" because, "[a]s a general rule, the law will intervene only when the distress inflicted is so intense and painful that no reasonable person could be expected to endure it" and "the distress here does not meet the severity" required). While the Court is sympathetic to the distress Plaintiff felt after the death of Mr. Morgan and the loss of her job, Plaintiff has offered no evidence that she suffered severe emotional distress to the extent required by Illinois case law. *See id.*

IV.    Conclusion

        Plaintiff has not pointed to any facts raising a genuine material issue that would defeat Defendants' motions for summary judgment. For the various reasons set forth above, Defendants' motions for summary judgment are granted.

        So ordered.


                                        _Mark Filip_
                                        Mark Filip
                                        United States District Judge
                                        Northern District of Illinois


Date: _2-22-06_